UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS D. NOONAN,

      Plaintiff,

v.

COUNTY OF OAKLAND, ET AL.,

      Defendants.

_____/

Case No.  12-14930

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
MONA K. MAJZOUB

### ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CITY OF FARMINGTON HILLS AND DETECTIVE MORTON [82], DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [83] AS TO DEFENDANT COUNTY OF OAKLAND, AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [83] AS TO HERMAN BISHOP

This case involves Plaintiff's civil rights claims after Defendants arrested him and charged him with two felonies after Plaintiff reported the theft of his own car valued at $1,000-$1,500. Before the Court now are Defendants' City of Farmington Hills and Detective Nicole Tomasovich-Morton Motion for Summary Judgment [82], Plaintiff's Response [84], and Defendants' Reply [88] and Defendants' Oakland County and Detective Herman Bishop Motion for Summary Judgment [83], Plaintiff's Response [87], and Defendants' Reply [89].  The Court heard oral argument on the Motions [82, 83] on January 22, 2015.  For the following reasons Defendants', City of Farmington Hills and Detective Morton's, Motion for Summary Judgment [82] are DENIED.  Defendants',Oakland County and Detective Bishop's, Motion for

Summary Judgment [83] are GRANTED as to Defendant Herman Bishop, and DENIED as to Defendant County of Oakland.

## STATEMENT OF FACTS

### Background Facts About Plaintiff

Plaintiff was an attorney at a large law firm from September 1999 until 2014. Plaintiff became a partner in 2006.  He has focused his career on commercial litigation. For the ten years leading up to the facts underpinning this case, Plaintiff was billing between 1,800 and 2,300 hours a year.  In June 2010, when his car was stolen, Plaintiff was making over $100,000 a year.

Since his admittance to the Michigan bar, Plaintiff has always been a lawyer in good standing. Plaintiff has never declared bankruptcy, and he has never been convicted of a felony or misdemeanor involving theft or dishonesty. Plaintiff has never been arrested for or convicted of a drinking and driving violation.

In 2008, Plaintiff purchased the 2001 Pontiac Grand Prix.  It was subsequently stolen from his driveway.  Plaintiff purchased the car from his brother and received only one key. The key was an older style key without any buttons on it. When the car was stolen in 2010, it had approximately 180,000 miles on it. Despite his salary, Plaintiff was driving this car because "it was running well and [he's] not really that into cars." [84-2] Plaintiff dep. Plaintiff's brother confirmed that "[i]t's not unusual

for our family to be driving cars way past 100,000 miles, because it's "how [they] were raised." [84-3] David Noonan dep.

Plaintiff's brother recalls telling Defendant Detective Morton that two keys did exist to the car, but that he only gave one key to Plaintiff. He testified that he has no recollection of ever giving the second key to Plaintiff. As he confirmed, "[i]n Tom's mind there was only one key that existed." He expressly denied that he said that he gave Plaintiff two sets of keys with the vehicle at the time of the purchase. [84-3] David Noonan dep. Plaintiff has been clear throughout this litigation that he only ever had one key. [84-2] Plaintiff dep.

**Plaintiff's Car Is Stolen From His Driveway**

In June 2010, Plaintiff was living in Farmington Hills. On the evening of June 17, 2010, Plaintiff left work around 7:00 p.m., went to the gym, and then met a friend in Plymouth to watch the final half of a play-off basketball game. After two or three drinks over the course of an hour and a half, Plaintiff left a little after midnight and went home. On his way home, Plaintiff stopped and filled up his car with gas. Between midnight and 1:00 a.m. on June 18, 2010, Plaintiff parked his car in the driveway of his house. Plaintiff locked his car and took his keys into his house. He testified that he believes that he took one of his two employment security access cards into his house that evening.

Around 9:00 a.m. on June 18, 2010, as he was leaving for work, Plaintiff discovered that his car was stolen from his driveway. Plaintiff reported the car theft to the Farmington Hills Police Department and his insurance carrier that morning. At the time of the theft, the car was worth between $1,000 and $1,500.

**Defendant Detective Morton's Investigation**

Defendant Morton is an officer in the Farmington Hills Police Department. In January of 2010, Morton was assigned to the Auto Theft Unit. Morton served with the Auto Theft Unit until November 2013. The Auto Theft Unit is a multi-jurisdictional task force comprised of officers from Oakland County cities.

At the time of her appointment to the Auto Theft Unit, Morton was the last choice of the four Farmington Hills candidates considered for the Auto Theft Unit. She was the last choice for assignment to the Auto Theft Unit, because she did not have any investigative experience. Prior to her assignment to the Auto Theft Unit, Morton did not have any experience as an investigator on an auto theft case. Morton was put in this position as an investigator despite the fact that she had been previously criticized for not performing thorough investigations. [84-7] Officer Performance Evaluation. Once she arrived at the Auto Theft Unit, Morton did not receive any training, and there were no written policies or procedures upon which she could rely. Morton did not receive any training with regard to investigating automobile thefts until after she caused charges to be brought against Plaintiff.

Prior to being assigned to the Auto Theft Unit, Morton received no training from Farmington Hills in establishing probable cause. Farmington Hills Police Commander Stasch testified that, in Farmington Hills, detectives do not need to seek a supervisor's approval to seek a warrant or go to the prosecutor with a case—i.e. that probable cause is only established by an officer knowing it when he or she sees it. Similarly, in Oakland County, there are no policies and procedures established for determining probable cause.

While she was assigned to the Auto Theft Unit, Morton always received her paycheck from Farmington Hills. She also was driving an undercover Farmington Hills police car. Farmington Hills retained a supervisory role over Morton while she was posted with the Auto Theft Unit which included review of her reports. Despite this purported review, Morton could always take the case to the prosecutor on her own, without any oversight by Farmington Hills. Nor did Morton have any obligations to report to her Oakland County supervisor regarding charges she would seek from the prosecutors.

**Bishop and Morton Interrogations of Plaintiff**

Because the theft of Plaintiff's car occurred in Farmington Hills, Defendant Morton was the Auto Theft Unit investigator assigned the case. Plaintiff initially met with Morton on July 6, 2010. Morton's report from this July 6, 2010, meeting claims that Plaintiff appeared to be "very nervous, shaking, sweating and stumbling over his

words." Plaintiff alleges that none of those statements accurately describe him during

that meeting. Rather, Plaintiff asserts was cooperative.

At the July 6, 2010 meeting, Morton advised Plaintiff that his car had been

recovered with a key in the ignition shortly after its theft. At that meeting, Morton

showed Plaintiff a large set of keys that she said were found with the car. Plaintiff

denied that the keys Morton showed him were his.[1]  Morton also showed Plaintiff a

security pass card that Plaintiff said might be one of his pass cards for work that he

left in his car. The pass key was not attached to any key that looked like the key to

Plaintiff's car. Plaintiff gave Morton his only key to the car at this initial meeting.

Plaintiff also filled out a vehicle theft report.

Plaintiff next met with Morton on July 21, 2010. Defendant Oakland County

Sheriff Detective Bishop attended this meeting as well.  At the outset of this meeting,

Plaintiff asserts that he was "very calm." This is contrary to Morton's report that

claimed that Plaintiff was shaking and stumbling over his words. Morton's report

from July 21, 2010 also claimed that Plaintiff just "wanted to get this whole process

---

[1] Neither Oakland County nor Farmington Hills are in possession of the keys
at issue in this case. Morton claims to have sent the keys found with Mr. Noonan's
car back to the person who picked up the car from Oakland County.  Morton could
not identify to whom she sent the keys, and had no record of sending those keys to
anyone. Farmington Hills Special Order 09-006 requires that all property returned
to a victim be photographed. No photographs of the keys were produced by
Farmington Hills.

behind him. He wanted it done." Plaintiff denies that assertion by Morton because he was glad to be getting his car back, and that it had "been a pain the ass borrowing cars." At this meeting, Plaintiff indicated that his brother believed that he might have given Plaintiff another key, but that Plaintiff never recalled having a second key.

Later during the July 21, 2010 meeting, Plaintiff became agitated because Bishop accused him of arranging for the theft of his car because he needed the money. Bishop accused Plaintiff of pulling an "insurance scam job." Morton then pulled a key from an envelope and asked Plaintiff if it was the key he gave her at the July 6, 2010 meeting. Plaintiff said it looked like the key that he had given to her previously. Detective Morton then advised him that it was not the key he had given her, but the key that was found in the car. Throughout this meeting, Bishop advised Plaintiff that the evidence "all points to him."

The day after the July 21, 2010 meeting, Plaintiff retained counsel. Morton shredded all of her notes from these two interviews.

**Defendants Charge Plaintiff with Two Felonies**

Plaintiff was charged with two felonies: insurance fraud and falsely reporting a felony. On August 9, 2010, Plaintiff was arraigned. An Auto Theft Unit conference was subsequently set for September, which Plaintiff was required to attend. Plaintiff alleges that he feared being held in jail if he failed to appear at these hearings.

Morton testified that she went to the prosecutor because she thought Plaintiff was lying about the theft of his car. Morton believed that Plaintiff was involved in an accident the night before it was stolen and that he did not leave the car in his driveway. During discovery, Morton was unable to specify any evidence to support that theory. Rather, Morton simply theorized that Plaintiff "had been drinking prior to driving home. . . . And, unfortunately, Plaintiff driving, hit something, fled the scene, and got home." Morton claimed that Plaintiff changed his story with regard to the events the evening his car disappeared. However, there is no report filed by Morton indicating that Plaintiff ever changed his story as to his whereabouts the night his car was stolen.

Morton testified that she believed Plaintiff was lying because he was "shaking and stumbling over his words." She testified that she believed he changed his story about his whereabouts the night the car went missing; the possible existence of two keys; and making loan payments. Specifically, with regard to the key, Morton claimed that Plaintiff was inconsistent because he said that he had two keys after, according to Morton, he initially had claimed to only have one key. Morton also claimed that Plaintiff's refusal to take a polygraph caused her to have suspicions. Although Morton was told to never include information about polygraphs in reports; she told the prosecutor about Plaintiff's alleged refusal to take a polygraph.

Based on Morton's report of "inconsistencies" to Oakland County Assistant Prosecutor and Morton's claim that Plaintiff refused a polygraph examination, Defendants made the decision to charge Plaintiff solely on the information provided by Morton.

**Exculpatory Evidence**

Plaintiff argues that substantial evidence existed and was known to Defendants to indicate that he did not commit the crimes with which they charged him. First, Plaintiff did not have a second key to the car in 2010. Plaintiff does not know how a key to his car was found in the ignition of his car at the time it was recovered by the police. Plaintiff insists that he only ever had one key to his stolen car—the key that was in his possession and that he gave to Morton at their initial meeting on July 6, 2010.

Plaintiff also argues that the purported loans that Bishop and Morton claim establish probable cause were not substantial enough for him to orchestrate the theft of his own low-value car. In 2010, Plaintiff had a school loan balance of approximately $10,000. Plaintiff was making monthly payments of $800, and the loan has since been paid-off in full. In April 2010, Plaintiff gave $2,500 to Cornerstone Schools. [1] at ¶ 60. The value of his car was between $1,000 and $1,500 when it was stolen. Morton testified that she had never charged someone with insurance fraud over a $1,500 car. Morton also testified that she had no idea how much Plaintiff earned or

the amount of his debts. Plaintiff asserts that she had no idea whether a $1,000 insurance check would have any impact on Plaintiff's finances, because she believed that "it doesn't matter what someone makes."

Plaintiff testified that he never refused a polygraph examination. Plaintiff did voluntarily submit himself to a polygraph examination on July 25, 2010—a few days after he met with Bishop and Morton.

Plaintiff also notes that significant evidence demonstrates that anyone could have stolen his car. Morton testified that it is very easy to get a re-key for a 2001 Pontiac Grand Prix. Bishop also testified that keys can be made from vehicle identification numbers for purposes of stealing cars.  That it is not unusual to have cars stolen based on the copying of keys in this fashion.

Sergeant Banycky confirmed that most car thefts in Farmington Hills happen in the south end of town, which is where Plaintiff lives. In spite of these facts, Morton and Bishop performed no further investigation than interviewing Plaintiff.

Morton admitted that no fingerprints were taken from surfaces in the recovered car, even though she believed the tequila bottle allegedly found in the car was Plaintiff's. The Detroit Police reported that eye witnesses identified someone running from the car after it was crashed within the City of Detroit. Morton claims that a few days after police recovered the car, she investigated by leaving her card at some houses on the street where the car was found. Morton claims that although she

investigated, she could not find the witnesses who spoke with the Detroit Police Department a few days earlier.

Years later, after being sued, Farmington Hills sent two different police officers into Detroit to find the witnesses who saw Plaintiff's stolen, crashed car. Years after the crash, these other two Farmington Hills officers found the witnesses who told the officers that a skinny, African-American male was seen running from Plaintiff's crashed car. Plaintiff is Caucasian. Upon locating the witnesses in 2013, the two Farmington Hills officers learned that Detroit Police had apprehended the subject, brought the subject back to the two witnesses who identified him, and Detroit Police arrested the subject. [84-12] at 2.

Plaintiff asserts that no evidence ever tied Plaintiff to certain items found inside his recovered car. Plaintiff denied ownership of the large set of keys found in his car. Defendants never investigated them despite a LegalShield tag that was attached to the key chain. But, Plaintiff's lawyers' subsequent investigation of the key chain and tag in this civil action revealed that the LegalShield tag on the keys belonged to someone who lives in Detroit and who has no connection to Plaintiff. [79]. Neither Bishop nor Morton investigated the origins of the tag even though it had a clearly identifiable member number listed on it. This tag, available to Bishop and Morton at the time they sought to charge Plaintiff, ultimately led the Prosecutor to conclude that the keys found in the car were not Plaintiff's keys.  Moreover, in making the decision to

dismiss the claims against Plaintiff, the Prosecutor noted that a second pass card—identical to the one attached to the large set of keys—was found in Plaintiff's car and that Plaintiff was probably confused when he indicated the pass card attached to the keys could have been his. Because Plaintiff passed the polygraph test administered by Oakland County, because Defendants could not link the keys found in the car to Plaintiff, and because Defendants could not prove that the security swipe card found on the keychain in Plaintiff's car belonged to him, the Prosecutor dismissed the charges against Plaintiff.

**Plaintiff's Damages**

Plaintiff asserts that his billable hours at his job dropped significantly due to the ongoing threat of going to jail. As a consequence of his hours dropping significantly, Plaintiff's salary was severely cut. Moreover, Plaintiff asserts that he suffered a significant detrimental emotional impact of being charged with crimes he did not commit while serving as a lawyer. Plaintiff also paid attorney fees. Plaintiff also suffered damages to his professional reputation.

<u>**STANDARD OF REVIEW**</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the

burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## <u>ANALYSIS</u>

Plaintiff asserts only one claim—malicious prosecution—against each Defendant. To succeed on a malicious-prosecution claim under § 1983, when the claim is premised on a violation of the Fourth Amendment, Plaintiff must prove that: (1) a criminal prosecution was initiated against him and that Defendants made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) as a consequence of a legal proceeding, Plaintiff suffered a deprivation of liberty under the Fourth Amendment, apart from the initial seizure; and (4) the criminal proceeding was resolved in Plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308—09 (6th Cir. 2010). Despite the misnomer of his claim, Plaintiff is not required to demonstrate malice to prevail on a claim for malicious prosecution under the Fourth Amendment. *Id.* at 309.

## I. Defendants Farmington Hills and Detective Nicole Tomasovich-Morton's Motion for Summary Judgment [82]

Defendants Farmington Hills and Detective Morton dispute only two elements: (2) that there was a lack of probable cause and (3) that Plaintiff suffered a deprivation of liberty under the Fourth Amendment, apart from the initial seizure. Alternatively, Defendants argue that Morton is entitled to qualified immunity and Plaintiff's *Monell* claim against Farmington Hills fails because no custom or policy caused Plaintiff's alleged constitutional deprivation.

## A. Element of Malicious Prosecution: Probable Cause

Defendants point to several pieces of evidence that established probable cause at the relevant points in the timeline. Defendants assert that Plaintiff changed his story between the July 6, 2010 and July 21, 2010 interviews about whether there was more than one key to the car. Morton also testified that she found it odd that, during the July 6 interview, Plaintiff stated that he was surprised they had found his car so quickly. Next, Defendants cite that Plaintiff changed his story about whether the keys and passcard recovered in the car were his. Defendants also argue that, although Plaintiff disputes his actual demeanor during the interviews, he cannot dispute that Morton and Bishop believe he appeared nervous. Next, Defendants state that, although Plaintiff told police there was only a small dent in the rear bumper, when the car was recovered, there was substantial damage inconsistent with the final collision.

Defendants also state that there was no sign of forced entry on Plaintiff's driveway or on the car when it was recovered.

Defendants also assert that multiple motives for Plaintiff to have committed the charged crimes arose during their investigation. Defendants assert that Plaintiff described having difficulties repaying his student loans and having a hard time in general financially. Defendants also assert that Plaintiff told his criminal attorney that he was having trouble with his mortgage, student loans, and medical bills. Motion [82] Ex. 3 at 186—87. Defendants assert that Plaintiff changed his version of the events about whether he came straight home from work or whether he went out drinking with a friend the night before. Defendants argue that this change of story indicated to them that he may have had an alcohol-related accident and abandoned his car and reported it stolen.

Construing the facts on summary judgment in the light most favorable to the non-moving party usually means adopting the plaintiff's version of the facts. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The version of facts recited in Plaintiff's Response [84] disputes that his unsureness about whether there were two sets of keys was suspicious at all. Plaintiff's characterization of the confusion about the number of keys as not suspicious is supported by Plaintiff's brother's testimony that he only gave Plaintiff one set of keys when he sold Plaintiff the car. Plaintiff also disputes in turn each fact upon which Defendants premise probable cause.

In general, the existence of probable cause in § 1983 action based on allegedly unlawful arrest presents a jury question, unless there is only one reasonable determination possible. *Kinlin v. Kline*, 749 F.3d 573, 578 (6th Cir 2014). Inquiry into whether there was probable cause for an arrest turns on whether the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense. *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005). Plaintiff has shown that there is a genuine question of material fact about whether Morton's knowledge in August of 2010 was sufficient to warrant a prudent person to believe that Plaintiff had falsely reported his car stolen.

Additionally, although Defendants assert and show that Plaintiff told his criminal attorney that he was having trouble with his mortgage, student loans, and medical bills, the relevant question is what Defendants knew at the times they sought a warrant and charged Plaintiff. *Lyons*, 417 F.3d at 573. Morton sought a warrant in and Plaintiff was charged in August of 2010. Plaintiff's criminal defense attorney was deposed on October 15, 2013. Since the question for a jury would also be whether probable cause existed on those dates before defense counsel's deposition, evidence from the deposition would likely be excluded as irrelevant.

Finally, although Morton had no duty to investigate every possible theory of the case, it is troubling that Morton claims she could not find the crash witnesses days

after the crash when charging Plaintiff with two felonies, but, when defending this lawsuit years later, two different Farmington Hills offices found the witnesses quite easily. Further, the witnesses indicated that the suspect who had fled from the scene had been arrested by Detroit Police shortly after fleeing and the car was left at the scene. Given that Defendants ended up with custody of the car, there must have been some level of coordination between the jurisdictions. It is troubling that Defendants arranged to take custody of the car, but not to inquire about any perpetrators. Thus, effectively there was no pre-charging investigation.

## B. Element of Malicious Prosecution: Deprivation of Liberty Under the Fourth Amendment

Defendants argue that because Plaintiff was never arrested, incarcerated, or required to post anything other than a personal recognizance bond he did not suffer a deprivation of liberty. Plaintiff, however, was compelled to attend hearings on the felony charges brought against him. This Circuit has long held that required court appearances are sufficient to constitute a deprivation of liberty. *Bacon v. Patera*, 772 F.2d 259, 265 (6th Cir. 1985). Additionally, the detrimental effect of the criminal investigation of Plaintiff on his employment and income constitutes a liberty interest violation. *See Id.* As a matter of law, Plaintiff suffered a deprivation of liberty.

**C. Qualified Immunity as to Morton**

Qualified immunity protects officers from both liability and trial in § 1983 actions so long as they did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, where a genuine question of material fact exists about whether an officer violated a plaintiff's constitutional rights, summary judgment for defendants on qualified immunity is precluded. *See Greco v. Livingston County*, 2014 WL 7240680 at *2 (6th Cir. 2014) (Sutton, J.) (affirming denial of summary judgment on qualified immunity defense where there was a question of fact about whether defendants violated plaintiff's Fourth Amendment rights in a § 1983 action). This is where the "light most favorable to the plaintiff" language kicks in: Even if the Court believes Defendants' version of the facts, the question remains whether a jury could reasonably decide that Morton violated Plaintiff's Fourth Amendment rights. *Id.*

**D. *Monell* Claim as to Farmington Hills**

A municipality may be held liable under § 1983 if a plaintiff shows she was injured "pursuant to official municipal policy of some nature." *Monell v. New York City Dept. of Social Servs.*, 436 v. 658, 691 (1978) Municipal liability may be imposed under § 1983 for a single decision made by a municipal policymaker in certain circumstances. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 477–84 (1986) (modifying *Monell*). Plaintiff purports to establish municipal liability by showing that

an official with final decision making authority ratified illegal actions or the existence of a policy of inadequate training or supervision. *D'Ambrosio v. Marion*, 747 F.3d 378, 386 (6th Cir. 2014).

Farmington Hills can be held liable under Plaintiff's failure-to-train theory if his injuries can be attributed to the Farmington's failure to adequately train Morton and this failure amounted to "deliberate indifference" to the rights of members of the public. *City of Canton, Ohio v, Harris,* 489 U.S. 378, 388 (1989). Specifically, Plaintiff must show: (1) that Morton's training was inadequate to prepare her for the tasks she was expected to perform; (2) that the inadequacy persisted due to the City's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused Plaintiff's injuries. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 794 (6th Cir. 2012).

Plaintiff has satisfied the first element; Morton received no training after joining the Auto Theft Unit until after Plaintiff had been charged. As to the second element, in certain cases, where the constitutional violation is a highly predictable consequence of the failure to train, a finding of "deliberate indifference" on the part of policymakers is justified. *Canton*, 489 U.S. at 390. In such cases, municipal liability can be triggered by evidence of a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations. *Id*. Here, it seems fairly predictable that hiring the least qualified candidate

and failing to train her to be a detective with unilateral authority to seek warrants and charges would lead to the violation of federal rights. As to element three, the inadequacy of Morton's training is directly related to Plaintiff's injuries. Defendants are not entitled to summary judgment on Plaintiff's failure-to-train theory.

Plaintiff can also establish Farmington Hills' liability by showing that an official with final decision making authority ratified illegal actions. Plaintiff asserts two mutually sufficient ways he can do this—that Morton was a final decision maker or that final decision makers ratified Morton's actions. Plaintiff argues that Morton was a final decision maker because she had complete discretion to charge subjects. The Sixth Circuit has held that where investigators who had complete discretion to conduct their own investigations, it was a question for the jury whether investigators were final decision makers. *Monster v. City of Memphis*, 115 F. App'x 845, 851 (6th Cir. 2004). Here, Morton had a greater power than conducting her own investigations—to seek charges. Defendants are not entitled to summary judgment on Plaintiff's Morton as a final decision maker theory.

A failure to investigate or the ratification of illegal acts can constitute evidence of an official "policy of deliberate indifference." *Skovgard v. Pedro*, 448 F. App'x 538, 548 (6th Cir. 2011). Here, Farmington Hills's failure to take any action to even investigate Morton's conduct could be viewed as an implicit ratification of her

behavior. Defendants are not entitled to summary judgment on Plaintiff's ratification by a the municipality theory.

## II. Defendants Oakland County and Detective Herman Bishop's Motion for Summary Judgment [83]

Defendants Oakland County and Detective Herman Bishop dispute only one element of Plaintiff's malicious prosecution claim: (1) that Bishop made, influenced, or participated in the decision to prosecute. *Sykes v. Anderson*, 625 F. 3d 294, 308—09 (6th Cir. 2010). Alternatively, Defendants argue that Bishop is entitled to qualified immunity and Plaintiff's *Monell* claim against Oakland fails because no custom or policy caused Plaintiff's alleged constitutional deprivation.

### A. Element of Malicious Prosecution: Decision to Prosecute as to Bishop

Defendants claim that Bishop's involvement in the investigation of Plaintiff's stolen car was limited to observing Morton's interviews of Plaintiff. Plaintiff's testimony directly contradicts that assertion. Plaintiff testified that during the July 21 interview, Bishop said to him that all the evidence pointed toward [Plaintiff]. Plaintiff asserts that Bishop supervised, encouraged, and advised Morton that she had a good case. Bishop should be dismissed from this case because he did not participate in the decision to prosecute Plaintiff. *See Hunt v. City of Cleveland*, 563 F. App'x 404 (6th

Cir. 2014) (dismissing officers where there was no question of fact that the officers had not turned over false information to a prosecutor).[2]

## B. Qualified Immunity as to Bishop

It is unnecessary to analyze whether Bishop is entitled to qualified immunity because Plaintiff cannot establish a prima facie case of malicious prosecution against him.

## C. *Monell* claim as to Oakland County

Plaintiff and Defendants both seem to be proceeding on the premise that Oakland County can be liable under *Monell* based on Morton's action as a result of her position on the Auto Theft Unit. There are no cases on-point cases about multi-jurisdictional task forces and *Monell* and I am inclined to adopt the parties' presumption.  Accordingly, Plaintiff's *Monell* claims as to Oakland County survive summary judgment for the same reasons elaborated *supra*.

---

[2] Morton's analysis under the element of contribution to decision to prosecute differs from Bishop's because there is a genuine question of material fact about whether she submitted false information to the prosecutor in order to fabricate probable cause.

## <u>CONCLUSION</u>

**IT IS ORDERED** that Defendants', City of Farmington Hills and Detective Morton's, Motion for Summary Judgment [82] is **DENIED.**

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment [83] is **GRANTED** as to Defendant Herman Bishop and **DENIED** as to Defendant County of Oakland.

**IT IS FURTHER ORDERED** that Defendant Herman Bishop is **DISMISSED** from this case.

s/Arthur J. Tarnow<br>
Arthur J. Tarnow<br>
Senior United States District Judge

Dated: September 30, 2015